Los Hnos. de apellidos PAZ-TORRES, LUIS, FRANCISCA, MARCELINA, GEORGINA y JOSEFA ENCARNACIÓN, demandantes y apelantes, *v.* Los Hnos. de apellidos FERNÁNDEZ-PAZ, ANTONIO, CARMEN LUISA, JUANA MANUELA y MARÍA DEL SOCORRO, demandados y apelados.

Número 10353.

*Sometido:* 5 de abril de 1951. *Resuelto:* 22 de junio de 1954.

744

*Isaías M. Crespo* y *E. Martínez Avilés,* abogados de los apelantes; *Juan Enrique Géigel* y *Guillermo Silva,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

El 23 de octubre de 1934 Don Luis Paz Urdaz otorgó testamento abierto ante el notario don Carlos del Toro Fernández, legando a cuatro de sus sobrinos, aquí demandantes apelantes, dos propiedades inmuebles en la ciudad de San Juan, e instituyendo como únicos y universales herederos en el remanente de sus bienes—otras diez propiedades inmuebles—a sus otros cuatro sobrinos, los aquí demandados apelados. Paz Urdaz falleció en Río Piedras el 13 de febrero de 1948 en estado de soltería, sin haber procreado hijos y sin que le sobreviviera ascendiente alguno. Tres días después de su muerte los demandantes iniciaron el presente pleito impugnando la validez del referido testamento. Los motivos de nulidad en que se funda serán examinados en el curso de esta opinión al considerar los doce errores señalados por los demandantes, quienes apelaron de la sentencia que declaró sin lugar su demanda.

El primer señalamiento de error es uno genérico que incluye los motivos de nulidad que luego se especifican en señalamientos separados. Habremos de considerarlos en esta última forma.

■ El segundo error imputado al tribunal sentenciador —primero de los motivos de nulidad—es el de haber resuelto que la escritura de testamento fué otorgada en un solo acto.

Está envuelta aquí la formalidad de la *unidad de acto* requerida en el otorgamiento del testamento abierto por el art. 649 del Código Civil (ed. 1930), al disponer que: "Todas las formalidades expresadas en esta sección se practicarán en un solo acto, sin que sea lícita ninguna interrupción, salvo la que pueda ser motivada por algún accidente pasajero. . . ."

Los apelantes no hacen mención específica en su alegato de la etapa de la unidad de acto que no fué observada, pero parecen sostener—por su análisis de la prueba testifical sobre la presencia de los testigos en el acto de otorgamiento y firma del testamento—que los testigos no estaban presentes al momento de manifestar el testador su conformidad con la voluntad expresada en el testamento, lo cual, desde luego, infringiría el principio de la unidad de acto. Sentencia del Tribunal Supremo de España de 18 de noviembre de 1918. Aun cuando sobre dicho principio de la unidad de acto el Tribunal Supremo de España ha dicho reiteradamente que "no ha de entenderse en el sentido de que haya de redactarse y firmarse el testamento en una sola sesión, sino en el de que sólo la lectura del testamento, la manifestación de la voluntad del testador y la firma de éste y demás personas concurrentes, se han de llevar a cabo sin interrupción alguna," Sentencias del Tribunal Supremo de España de 1 de febrero de 1907, 28 de enero de 1909, 28 de diciembre de 1918 y 29 de diciembre de 1927; 4 Castán Tobeñas, Derecho Civil, Común y Foral, 313; 3 Clemente de Diego, Instituciones del Derecho Civil Español, 66 (nota 1), las conclusiones del tribunal sentenciador, sostenidas por la prueba—que derrotan la contención de los apelantes en este señalamiento de error—fue-

ron al efecto de que en el acto del otorgamiento de dicha escritura, y durante la lectura de la misma, estuvieron presentes en la oficina del notario autorizante, . . . el testador . . ., el propio notario autorizante y los testigos instrumentales, Enrique Ramírez de Arellano, Antonio Julián Baco y Tomás Caballero Woss; que estando todas dichas personas presentes el notario preguntó si deseaban leer la escritura, derecho que les asistía, y ante la negativa de todos procedió él a leerla en voz alta, hecho lo cual procedió a firmarla el testador y los testigos.

■■ El tercer error señalado por los apelantes es el de no haber el tribunal a quo declarado nulo el testamento a pesar de que en el mismo el Notario no consignó que a juicio suyo, y con arreglo a manifestaciones que ante él hubieran hecho, los testigos instrumentales no se hallaban comprendidos en ninguna de las prohibiciones establecidas por el Código Civil.

La escritura de testamento abierto objeto de este litigio en su única referencia a los testigos lee:

"Así lo dijo y otorgó a mi presencia y a la de los testigos instrumentales . . ., mayores de edad, vecinos de esta ciudad capital donde se verifica el otorgamiento, *los que conocen, entienden y ven al testador*. Y leída por mi en alta voz esta escritura, y la ratifica y firma el testador con los testigos instrumentales. Del conocimiento de tales testigos y de haberse cumplido todas las formalidades prescritas por la Sección Quinta, capítulo primero, título tercero del Código Civil Revisado de Puerto Rico, yo, el notario DOY FE." (Bastardillas nuestras.)

El art. 644 de nuestro Código Civil, ed. 1930, dispone en su primer párrafo:

"El testamento abierto deberá ser otorgado ante notario y tres testigos idóneos que vean y entiendan al testador, y de los cuales uno, a lo menos, sepa y pueda leer y escribir."

A tenor con el citado artículo, los tres testigos que autorizan el testamento abierto han de tener la cualidad de *idóneos*. Esta idoneidad, según apunta Castán Tobeñas, resulta

de la inexistencia de las causas de incapacidad señaladas por el Código, pero, además tratándose de testamento abierto, está integrada por las dos condiciones positivas siguientes; (1) que los testigos, lo mismo que el notario, vean y entiendan al testador; (2) que uno de los tres testigos, por lo menos, sepa y pueda escribir, con objeto de que pueda firmar a nombre de los que no sepan, o del testador, y para alejar el peligro de fraudes y simulaciones. Castán Tobeñas, obra y tomo citados, pág. 307.

No existe disposición alguna en el Código Civil que exija del notario autorizante de un testamento abierto que haga constar en el mismo que los testigos instrumentales no están comprendidos entre las prohibiciones que para servir como tales señala el propio Código. Según hemos señalado, sólo se requiere que sean tres testigos idóneos, que vean y entiendan al testador, y que uno de los tres por lo menos, sepa y pueda escribir. No existiendo precepto de ley positiva alguno que exija el cumplimiento, so pena de nulidad, del vicio atribuido al testamento en este señalamiento de error, los apelantes citan en su apoyo la Resolución de la Dirección de Registros de España de 12 de febrero de 1901 al efecto de que "el notario debe consignar en el testamento, bajo pena de nulidad, que los testigos instrumentales, a juicio del mismo y con arreglo a las manifestaciones que ante él hubieren hecho, previamente requeridos, no se hallan comprendidos en ninguna de las prohibiciones establecidas por el Código Civil." Si bien la resolución expuesta se refiere a testamentos, el doctor Castán Tobeñas llama la atención hacia el hecho de que tal resolución establece una *"norma enteramente contraria a la que reiteradamente tiene establecida el mismo Centro para los actos intervivos."* (Bastardillas nuestras.) Castán Tobeñas, ob. y t. citados, pág. 287, haciendo referencia a Resoluciones de 23 de octubre y 5 de diciembre de 1903 y 5 de febrero, 4 de marzo y 20 de julio de 1904. Nos inclinamos a no seguir la doctrina expresada en la solitaria Resolución de la Dirección de Registros de España de 12 de

febrero de 1901 y por el contrario nos ratificamos en lo dicho por este Tribunal en *Pacheco* v. *Sucn. Pacheco*, 66 D.P.R. 796, al efecto de que no todas las omisiones en que pueda incurrir un notario al otorgar una escritura de testamento necesariamente vicia de nulidad el mismo. Véanse *Bardeguez* v. *El Registrador*, 27 D.P.R. 214; *Morales* v. *Registrador*, 35 D.P.R. 905; 5 Manresa, Comentarios al Código Civil Español, 5ta. ed., págs 473–475–476; Castán Tobeñas, ob. y t. cit., págs. 392–394; Sentencia del Tribunal Supremo de España de 30 de abril de 1909.

La omisión en el caso de autos no vicia de nulidad el otorgamiento del testamento, ya que substancialmente se cumplió con la exigencia que establece el Código Civil en el art. 644, al concurrir en dicho otorgamiento tres testigos idóneos—su idoneidad nunca fué impugnada—que conocían, veían y entendían al testador y de lo cual dió fe el notario, así como dió fe de haberse cumplido todas las formalidades prescritas para tales actos, según requeridas por el Código Civil.

■ Se señala como cuarto error que el notario no dió fe de hallarse el otorgante, a su juicio, en el goce de sus facultades mentales, y que tampoco consignaron ese hecho los testigos. El art. 645 del Código Civil (ed. 1930), en su párrafo final dispone:

"El notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento."

En cuanto a la capacidad del testador en el caso de autos, el notario autorizante hizo constar en la escritura lo siguiente:

"Doy fe del conocimiento personal del compareciente, y por sus dichos, de su edad, estado, profesión y vecindad. Me asegura tener el libre uso de sus facultades intelectuales, habla expedita y capacidad legal necesaria para disponer su testamento, como así parece a juicio de tales testigos y de mí, el Notario; . . ."

El precepto del código arriba transcrito es idéntico al contenido del art. 655 del Código Español, último párrafo, e interpretando tal disposición ha resuelto el Tribunal Supremo de España que "no es causa de nulidad del testamento el que el notario no haya hecho constar, que a su juicio, se hallaba el testador con la necesaria capacidad cuando siquiera incidentalmente se dice en la primera parte de aquel documento que al notario y testigos *parecía* que el testador tenía la integridad de sus facultades mentales y la capacidad legal, añadiendo al final que éste era el juicio de los testigos, puesto que la ley no exige que se haga constar con párrafo especial y con las palabras precisas *a su juicio,* ya que esta locución equivale a la de *en su opinión, en su sentir, a su parecer."* Sentencias 6 de abril de 1896 y 24 de diciembre de 1896.

El notario no está obligado a emplear las mismas palabras que expresa nuestro Código en su art. 645 (695 del Código Civil Español) pudiendo usar otras distintas que indiquen la misma idea, pues "lo esencial no son las palabras empleadas, sino que el notario *considera al testador con suficiente capacidad para testar."* Manresa, ob. y t. citados, pág. 521; Sentencias del Tribunal Supremo de 6 de abril y 24 de diciembre de 1896. Véase *Morales* v. *Registrador,* 35 D.P.R. 905. Se cumplió a nuestro juicio con lo preceptuado en el art. 645 respecto a la capacidad del testador al hacerse constar en el testamento aquí impugnado, aunque en palabras distintas a las del Código, que el testador aseguró estar en el libre uso de sus facultades intelectuales y tener la capacidad legal necesaria, y que a juicio de los testigos y del notario así les pareció.

Como quinto error se señala el de haber considerado el tribunal sentenciador que el testador y los testigos expresaron su conformidad con el testamento redactado.

La disposición de ley pertinente es el art. 645 del Código Civil en su parte que dispone:

"El testador expresará su última voluntad al notario y a los testigos. Redactado el testamento con arreglo a ella y con ex-

presión del lugar, año, mes, día y hora de su otorgamiento, se leerá en alta voz, para que el testador manifieste si está conforme con su voluntad. Tanto el testador como los testigos podrán leer por sí mismos el testamento, debiendo el notario advertirles de este su derecho.

"Si el testador y los testigos estuviesen conformes, será firmado en el acto el testamento por uno y por otros que puedan hacerlo.

".          .          .          .          .          .          .          ."

Interpretando similar disposición el Tribunal Supremo de España ha resuelto que es nulo el testamento en que sólo se indica haberse hecho la lectura y no se expresa que el testador se enterara de su contenido y le prestara su conformidad, Sentencia de 14 de julio de 1899; y que no basta la firma del testador para acreditar dicha conformidad, pues ésta ha de ser expresada. Sentencia de 18 de noviembre de 1915. Véanse Manresa, ob. y t. citados, pág. 517; 3 Oyuelos, Digesto, pág. 305; Medina y Marañón, Leyes Civiles de España, ed. 1943, pág. 225; Clemente de Diego, ob. y t. citados, pág. 65.

El Código no establece cómo ha de expresarse la conformidad exigida. Sánchez Román señala que ésta ha de ser explícita, categórica e incondicional, cualesquiera que sean los términos más o menos amplios en la expresión con que se manifieste, incluso las meras afirmaciones de ella con monosílabos, siempre que resulte indudable para testigos y notario, y éste pueda consignarlo como cierto en el instrumento. Sánchez Román, Derecho Civil, Tomo 6 (1), 2da. ed., pág. 432; Castán Tobeñas, ob. y t. citados, pág. 311.

Al final de la escritura de testamento que nos ocupa el notario consignó lo siguiente:

"Y leída por mí en alta voz *la ratifica* y firma el testador con los testigos instrumentales." (Bastardillas nuestras.)

Lo antes transcrito cumple a nuestro juicio con el requisito formal del Código. El notario hace constar, luego de leer en alta voz la escritura que el testador "la ratifica". *Ratificar* significa, *aprobar*, o confirmar actos, palabras o escritos dán-

dolos por verdaderos y CIERTOS. Diccionario de la Lengua Española, Real Academia de España, ed. 1941, pág. 1068. *Ratificándose* el testador en lo leído en alta voz por el notario ante él y los testigos, expresó su conformidad entre lo leídole y su voluntad, como así lo hicieron los testigos que junto con el testador procedieron a la firma del testamento. Quedó, en este extremo, cumplida la ley.

■ El sexto error señalado es el de haber resuelto el tribunal sentenciador que no es motivo de nulidad el no advertirle el notario al testador y testigos de su derecho a leer por sí el testamento. Sostienen los apelantes que tal advertencia debe aparecer consignada por el notario en la escritura, so pena de nulidad. La disposición del código pertinente es aquella parte del propio artículo 645 que provee que "Tanto el testador como los testigos podrán leer por sí mismos el testamento, *debiendo* el notario advertiles de éste su derecho." (Bastardillas nuestras.)

En cuanto a la cuestión de hecho envuelta en este señalamiento, el tribunal sentenciador llegó a la conclusión, con prueba suficiente, de que el notario hizo la advertencia correspondiente. En cuanto a la necesidad de expresión en la escritura de haberse cumplido con ese requisito, aparte de que nada en el precepto así lo exige, quedó cumplida al dar fe el notario, como lo hizo en este caso, de "haberse cumplido todas las formalidades prescritas en la sección quinta, capítulo primero, título tercero del Código Civil Revisado de Puerto Rico", entre las cuales está la que nos ocupa.

■ Como un séptimo error, señalan los apelantes que actuó equivocadamente el tribunal sentenciador al permitir curar los vicios de nulidad del testamento mediante prueba testifical.

Cierto es, como sostienen los apelantes, y como nos expresamos en *Ex parte Planis* v. *Pueblo*, 42 D.P.R. 689, 691, que la forma de testamentos es algo solemne creado por el estatuto. Si no se siguen las formalidades de ley no tiene validez el testamento. Tales formalidades no son meras cues-

tiones de evidencia, sino requisitos substantivos. Sin estos requisitos no hay testamento. Sin embargo, la apreciación de si en un testamento se han cumplido o no las formalidades legales es materia que incumbe a los tribunales, 5 Manresa, Código Civil Español, 5ta. ed., pág. 475; Sentencias del Tribunal Supremo de España de 23 de mayo de 1905, Jurisprudencia Civil, Tomo III, pág. 587–595 y de 20 de diciembre de 1913, 167 Jurisprudencia Civil 256, ya que el *cumplimiento* de aquéllas es cuestión de hecho que compete al tribunal, en su apreciación, determinar, antes de que pueda declarar nula una disposición testamentaria en la cual aparezca expresada clara y terminantemente la voluntad del testador. 167 Jurisprudencia Civil 256, supra.

Ya hemos indicado que las formalidades señaladas por los apelantes como incumplidas no eran de las esenciales que la ley exige que aparezcan consignadas en la escritura de testamento, o sea, no eran de las formalidades *de fondo* que, al quedar incumplidas, producen "ab initio" la nulidad del testamento, a distinción de las solemnidades externas o de forma, véase Manresa, ob. y t. citados, págs. 499–500, la apreciación de las cuales, en cuanto a si se han observado o no, y sus consecuencias, ha de determinar el tribunal, ya que, "en principio, no deben ser más ni menos que las precisas para hacer auténtica, segura y permanente la última voluntad." Clemente De Diego, Derecho Civil Español, pág. 52. El criterio que debe regir para tales determinaciones "no da igual valor a todas las solemnidades del testamento ni admite que la falta de cualquiera de ellas, lleve siempre aneja la sanción de nulidad del acto. Si bien a tenor del art. 687 del Código Civil Español—dice la sentencia de 30 de abril de 1909—será nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivamente establecidas, se impone, según regla de buen criterio, dada la naturaleza y significación de aquél, tener en cuenta la índole de dichas formalidades para apreciar, con relación a su trascendencia, el límite dentro del que pueden conceptuarse cumplidas, armonizando así la vo-

luntad conocida de un testador con los requisitos externos de su expresión." Castán Tobeñas, ob. y t. citados, pág. 392; Manresa, ob. y t. citados, pág. 473.

Habiendo llegado el tribunal sentenciador a la conclusión, por la prueba ante sí, de que las formalidades externas fueron todas cumplidas, y a la de que la única formalidad de fondo señalada como inobservada por los apelantes aparece de la faz del documento, no podemos convenir con los apelantes en que se cometió el error apuntado en el sentido de que permitió curar los vicios de nulidad del testamento mediante prueba testifical. Ninguna formalidad de fondo, de las que vician de nulidad el testamento, fué curada por la prueba a que dió crédito el tribunal sentenciador.

El octavo error va dirigido a impugnar la apreciación de la prueba. No estamos convencidos, después de un detenido estudio de la misma, de que en su apreciación el tribunal a quo incurriera en manifiesto error. En tales condiciones no intervendremos con sus conclusiones. *López* v. *Bravo*, 68 D.P.R. 506; *Maldonado* v. *Quetell*, 68 D.P.R. 420; *Rosado* v. *Rosario*, 69 D.P.R.R. 169; *Bird* v. *Bird*, 69 D.P.R. 369; *Rivera* v. *Hernández*, 70 D.P.R. 549; *Varela* v. *Fuentes*, 70 D.P.R. 879; *Gómez* v. *Díaz*, 72 D.P.R. 727; *Correa* v. *Mario Mercado e Hijos*, 72 D.P.R. 80.

El noveno señalamiento imputa error al tribunal a quo "al no haber tomado en consideración, después de haber sometido evidencia sobre el particular, los vicios sustanciales de forma de que adolecía la escritura de testamento . . . no empece que tales vicios de nulidad no hubieran sido levantados en las alegaciones." Aun cuando por otros motivos podría desestimarse este señalamiento, baste decir que hemos considerado en sus méritos, en el presente recurso, todos los motivos de nulidad en que se ha fundado la impugnación de los demandantes, sin que a nuestro juicio exista base para que su acción pueda prosperar.

Por los errores décimo y undécimo señalan los recurrentes que actuó equivocadamente el tribunal a quo al

no permitir declarar al testigo Luis Paz Urdaz—uno de los demandantes en el pleito—sobre la conversación que había tenido con el testador, su tío, referente a si había otorgado o no testamento y sobre otros particulares en relación con el mismo, y al rechazar como evidencia correspondencia sostenida por el testador con su hermana, madre de los demandantes y tía de los demandados.

Precisa que consignemos, a fin de un mejor entendimiento respecto a estos dos señalamientos de error, las circunstancias alrededor de las cuales se sostiene se han producido. Los demandantes alegaron como motivo de nulidad del testamento, además de otros ya considerados en el curso de esta opinión, el de que el mismo fué otorgado "con dolo o bajo la presión del dolo influenciado por palabras o insidias de todos y cada uno de los demandados quienes indujeron a dicho testador a otorgar dicho testamento en perjuicio de los demandantes utilizando para ello frases de descrédito o de supuesta ingratitud de los demandantes hacia el testador, haciendo ver a éste que los demandantes hablaban mal del testador y que trataban de perjudicar sus intereses y para conseguirlo se fueron a vivir con el testador en su propia casa de éste en Río Piedras, P. R., donde constantemente utilizaban la insidia y el descrédito hacia los demandantes para conseguir que dolosamente se otorgara el mencionado testamento, todo lo cual fué hecho maliciosamente por los demandados."

En otro párrafo de la demanda alegaron que "el causante no otorgó dicho testamento como un acto personalísimo sino que dejó su formación al arbitrio de los demandados quienes intervinieron en la designación de las proporciones que debían pertenecer a los herederos."

La prueba ofrecida para establecer las anteriores alegaciones consistió del testimonio de Luis Paz, uno de los demandantes, tendente "a llevar al ánimo del tribunal el hecho de que estas familias hacía tiempo que venían disgustadas y que esos disgustos empezaron desde la fecha en que se otorgó el testamento hasta la fecha en que murió el testador." A

esos efectos al testigo se le preguntó: "Durante una de esas visitas que usted hizo a su tío, ¿le expresó él si él había otorgado o no testamento?" Objetada la pregunta por el fundamento de que era inmaterial, ya que según preguntas anteriores preparatorias el testigo había declarado que sus visitas al testador ya enfermo, habían ocurrido "seis meses antes de morir"—el testamento fué otorgado el 23 de octubre de 1934 y el testador falleció el 14 de febrero de 1948—el tribunal admitió la pregunta, contestando el testigo: "Pues él me dijo que había hecho un testamento." Solicitaron entonces los demandados que se eliminara el testimonio, oponiéndose a que el testigo declarara sobre manifestaciones que le hubiere hecho el testador, invocando la prohibición de la Ley de 10 de marzo de 1904 (pág. 121). El tribunal sostuvo la objeción. (¹)

También ofrecieron los demandantes—objetándose por los demandados su admisibilidad por el mismo fundamento anterior—varias cartas escritas por el testador a su cuñada Cristina Torres Vda. de Paz, madre del demandante y testigo Luis Paz, y a hermanas de éste, y una aparentemente dirigida al propio testigo. Al sostenerse la objeción de los demandados estas cartas quedaron como evidencia ofrecida y no admitida y forman parte de los autos en apelación.

Argumentando estos dos señalamientos de error los demandantes sostienen que la Ley de 10 de marzo de 1904 prescribiendo quiénes son testigos hábiles, (²) no hacía inadmisible

---

(¹) Los demandantes no solicitaron que se permitiera el interrogatorio del testigo a fin de constituir pieza aparte y pudiera considerarse en apelación como evidencia ofrecida y no admitida.

(²) Dicha ley prescribe:

"En las demandas por o en contra de los albaceas testamentarios, administradores o tutores, en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria; y las prescripciones de esta Sección se aplicarán a todas las demandas por o en contra de los herederos y representantes legales de un finado, que se suscitaren de transacciones habidas con éste."

la prueba ofrecida y rechazada por el tribunal toda vez que el presente pleito no se derivaba de transacción alguna habida con el testador, envolviendo meramente, en cuanto al motivo de nulidad que ahora nos concierne, circunstancias demostrativas de dolo, las cuales hacían nulo el testamento.

Aunque para disponer de estos dos señalamientos no es necesario resolver la cuestión en la forma planteada por los apelantes, podemos conceder que por no tratarse en este caso de manifestaciones de un finado en un pleito originado de *transacciones* habidas con el mismo (³)—véanse las monografías en 115 A.L.R. 1425, 1426; 146 A.L.R. 250 *et seq.* y 173 A.L.R. 128 *et seq.* en las que se resume la jurisprudencia en cuanto al alcance del término *transacciones,* en sentido favorable y contrario a la contención de los apelantes—tales manifestaciones—si por otros motivos no eran inadmisibles—podían acreditarse a través de la persona que las recibió.   Sin embargo, en virtud de la naturaleza de este pleito y del motivo específico de impugnación que ahora consideramos—dolo —resulta evidente que la declaración de Luis Paz sobre su conversación con el testador seis meses antes de su muerte y alrededor de trece años después de otorgado el testamento, no constituía evidencia legalmente admisible para probar la imputación de dolo en el otorgamiento de aquel acto testamentario, como tampoco la constituía las cartas escritas en los años 1942 y 1943—ocho y nueve años después de su otorgamiento—las cuales no contienen referencia alguna ni al testamento, ni a su otorgamiento, ni a circunstancia alguna relacionada con el mismo, ni manifestación sobre conducta alguna

---

(³) En los casos de *Wilcox* v. *Axtmayer et al.,* 23 D.P.R. 343; *De la Rosa* v. *Sucn. Quevedo,* 47 D.P.R. 175; *Sánchez* v. *Sánchez,* 58 D.P.R. 577; *Rodríguez* v. *Arocho,* 62 D.P.R. 700; *Cestero* v. *Sucn. Cestero,* 35 D.P.R. 991; *Lezcano* v. *Sucn. Sifonte,* 42 D.P.R. 400; *Morales* v. *Ceide,* 51 D.P.R. 27; *Viera* v. *Sucn. Goitía,* 60 D.P.R. 653; *Boscio* v. *Vilá,* 67 D.P.R. 604 y *Pereles* v. *Martinó,* 73 D.P.R. 848, se trataba en una u otra forma de manifestaciones de un finado en pleitos que propiamente envolvían *transacciones,* en el sentido de relaciones o actos jurídicos contractuales.

de los demandados, o alguno de ellos, con relación al testamento; versando enteramente sobre asuntos ajenos al mismo.

La base para la impugnación de un testamento por la concurrencia de dolo es el art. 622 del Código Civil, equivalente al 673 del Código Civil Español, que dispone: "Será nulo el testamento otorgado con violencia, dolo o fraude." El Tribunal Supremo de España ha dicho, en Sentencia de 25 de octubre de 1928, que "El acto doloso está caracterizado por ser producto de astucia, maquinación o artificio empleados para engañar a la persona que lo realice por otra a quien pueda beneficiar el fin propuesto y con tal injusto procedimiento conseguido: es, por tanto, producto de un engaño o resultado de falta de verdad empleado por quien se proponga, y así lo haya conseguido, frustrar la ley o privar de derechos que la misma deriva, realizando un fraude con la consiguiente existencia de perjuicios apreciables", siendo necesario "que el heredero realizara hechos que tuvieran por objeto captar dolosamente la voluntad del causante para que éste otorgarse su testamento." No presumiéndose el dolo, éste debe probarse por quien lo invoca, con hechos que justifiquen plenamente que "la realidad de maquinaciones fraudulentas o palabras insidiosas que hayan producido un engaño o error suficiente", Sentencia del 22 de marzo de 1941, incidental a la captación o secuestro de la voluntad.

Ninguna prueba hay en autos, ni fué ofrecida, independiente de la declaración del demandante y testigo Luis Paz, tendente a establecer hechos o actos previos o contemporáneos al otorgamiento del acto testamentario por parte de los demandados que pudieran establecer las insidias o maquinaciones constitutivas del dolo necesario para invalidar el testamento. Independientemente del hecho de que una mera manifestación del testador, sin más, no constituiría la prueba suficiente para el establecimiento del dolo, el hecho cierto es que la prueba oral excluída hubiera girado alrededor de manifestaciones del testador trece años después de otorgado el

testamento, y, en cuanto a la escrita, ocho o nueve años después de hecho aquél, sin que aparezca tampoco de la prueba, ni de ofrecimiento alguno de prueba, el que el testador hubiera intentado revocar su disposición testamentaria anterior, lo cual, por ser un acto volitivo suyo pudo haber hecho en cualquier ocasión antes de su muerte.

No existen, por lo tanto, los errores que acabamos de discutir y es innecesario considerar el duodécimo, ya que éste es uno genérico de mero apuntamiento, que no se argumenta por los apelantes ni requiere o amerita ulterior discusión.

*La sentencia será confirmada.*